## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
* * * * * * * * *

**TONI SMITH**

        Plaintiff,

v.

**LIVE DOWNTOWN GRAND RAPIDS, LLC,
20 FULTON EAST LIMITED DIVIDEND
HOUSING ASSOCIATION, L.P., 20 FULTON
EAST II, LIMITED DIVIDEND HOUSING
ASSOCIATION, LP.**

        Defendants.

Case No.

Hon.

**COMPLAINT AND JURY
DEMAND**

## <u>COMPLAINT</u>

    **NOW COMES** Plaintiff, Toni Smith, by her attorneys, and states as follows:

### PARTIES AND JURISDICTION

1)    Plaintiff Toni Smith is a resident of Grand Rapids, Michigan.

2)    Defendant Live Downtown Grand Rapids, LLC ("Live Downtown") is a limited liability company formed in Michigan, which regularly does business in Grand Rapids, Michigan.

3)    Defendant 20 Fulton East, Limited Dividend Housing Association, LP ("20 Fulton East I"), is a limited partnership formed in Michigan, which regularly does business in Grand Rapids, Michigan.

4)    Defendant 20 Fulton East II, Limited Dividend Housing Association, LP ("20 Fulton East II"), is a limited partnership formed in Michigan, which regularly does business in Grand Rapids, Michigan.

5)    This Court has subject matter jurisdiction based on 28 U.S.C. §1331.

6)     Supplemental jurisdiction over the state law claims here asserted rests on principles of ancillary and pendent jurisdiction, 28 U.S.C. §1367(a). The claims arise from a common nucleus of operative facts with the federal claims alleged herein and are so related to the federal claims as to form part of the same controversy under Article III of the U.S. Constitution.

7)     Venue is proper in this district under 28 U.S.C. §1391 because each of the defendants resides in this district and because a substantial part of the events or omissions giving rise to the plaintiff's claims occurred in this district.

## FACTS COMMON TO ALL COUNTS

### LIHTC Background

8)     Since the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085), the federal government has offered low income housing tax credits ("LIHTC") to real estate developers who build or rehabilitate low-income housing.

9)     The Internal Revenue Code (Title 26, Section 42 of the United States Code) codifies this program, commonly referred to as "Section 42," and under which each state must designate a state housing credit agency to allocate tax credits. 26 U.S.C. § 42.

10)    The State of Michigan has designated the Michigan State Housing Development Authority ("MSHDA") as its state housing credit agency. M.C.L. § 125.1422b.

11)    The LIHTC program provides "a dollar for dollar reduction in tax liability" to a developer that agrees to provide a percentage of a project's units at reduced rental rates to low-income persons on property developed under the LIHTC program (referred to as "Low Income Units").  The benefit to the developer is a federal tax credit, which

can be claimed over a 10-year period ("Credit Period"), beginning when or after the Low Income Units are placed into service, *i.e.*, available for rental.

12)     In Michigan, a developer who seeks a tax credit allocation must submit an application to MSHDA, which awards tax credit allocations in a competitive process based on its determination of the state's housing needs and priorities.

13)     As part of the agreement to qualify for the tax credits, a LIHTC developer must execute an Extended Low-Income Housing Commitment with the state housing credit agency. This document must be recorded in the county land records as a covenant running with the land and requires the developer of the LIHTC Property to provided Low Income Units during the Extended Use Period.  26 U.S.C. § 42(h)(6).  In Michigan, an Extended Low-Income Housing Commitment is commonly referred to as a "Regulatory Agreement."

14)     The Internal Revenue Code and the Regulatory Agreement require the developer to rent the specified percentage of living units to low-income residents at lower-than-market rent. This percentage is often referred to as a "set aside," which can be as low as 20 percent or as high as 100 percent of the available units in the LIHTC development.

**Live Downtown Grand Rapids Background**

15)     In 2006, a Midland-based development company called Brookstone Capital, L.L.C. began developing LIHTC properties in Grand Rapids, Michigan. Since 2006, Brookstone Capital has developed at least eight LIHTC developments in or near downtown Grand Rapids, with over 300 tax credit units.

16)     The 20 Fulton East development is Brookstone Capital's most recent Grand Rapids development.

17)     20 Fulton East is made up of four entities: 20 Fulton East I; 20 Fulton East II; 20 Fulton St East, LLC, and 20 Fulton East Commercial, LLC. Upon information and belief, the four entities are jointly managed, and are jointly owned, except for the portions of the LPs that are owned by tax credit investors.

18)     20 Fulton East I and 20 Fulton East II each entered into a Regulatory Agreement with MSHDA, agreeing to provide low income housing in all of its rental units, and agreeing not to discriminate against HCV voucher holders.

19)     Defendant Live Downtown manages 20 Fulton East, along with the other LIHTC properties in Grand Rapids developed by Brookstone Capital.

20)     Live Downtown maintains a number of excessively restrictive policies for reviewing applicants for tenancy, often resulting in the denial of prospective tenants. These policies include restrictions based on criminal records, bankruptcies, and credit history.

21)     Live Downtown's application packet explains that an applicant will be denied if anyone in the household has ever filed bankruptcy, if there are any outstanding utilities owed, if there are any outstanding judgments, or if there are "any amounts in collections."

22)     These screening policies are much more restrictive than those of similar LIHTC and low-income developments in Grand Rapids.

23)     The combined effect of these policies is that minority and disabled households are under-represented in Live Downtown properties, as compared to other Grand Rapids developments.

**Disparate Impact—Disability**

24)     A disabled householder is six times less likely to find an apartment at a Live Downtown development than at a similar LIHTC development in downtown Grand Rapids.

25)     In fact, only 1.51 percent of all reporting households in Live Downtown properties had a householder with a disability, while 9.47 percent of the households at similar LIHTC developments had a householder with a disability.

26)     As such, reporting households at Live Downtown properties are 6 times less likely to be disabled than similar LIHTC property developments in downtown Grand Rapids. This difference is statistically significant.

27)     According to a recent study, bankruptcy filers are more likely to be black than white or Hispanic. According to the study, the black non-Hispanic population made up 10.5 percent of the U.S. population in 2000, but accounted for 22 percent of bankruptcy filers. Jonathan Fisher, *Who Files for Personal Bankruptcy in the United States?* Center for Economic Studies (September 2017).

28)     Becoming disabled is a negative financial shock that may result in a bankruptcy filing; 25-26 percent of bankruptcy filers report some kind of disability, which is more than 10 percentage points higher than the national average. *Who Files for Personal Bankruptcy in the United States?* Center for Economic Studies (September 2017).

29)     Another study found that "the risk of bankruptcy is disproportionately high among individuals applying for Social Security Disability Insurance ("SSDI"), and that the SSDI program may reduce bankruptcy risk." Tal Gross and Brad Trenkamp, *Risk of Bankruptcy among Applicants to Disability Insurance*, Journal of Health Care for the Poor and Underserved, Volume 26, Number 4 (November, 4, 2015) at 1155.

**Disparate Impact - Race**

30)     Based on public records available from MSHDA, Plaintiff determined that there are half as many black householders in Live Downtown-managed properties than there were in similar LIHTC properties.

31)     In fact, black householders occupied only 11.5 percent of the units managed by Live Downtown; in contrast, 22.89 percent of the units managed by similar LIHTC developers were occupied by black householders.

32)     This is a statistically significant difference.

33)     Consumer surveys have consistently found that non-white households are more likely than white households to have debts in collection.  A survey by the Consumer Financial Protection Bureau ("CFPB") found that 44 percent of non-white respondents had been contacted about a debt in collection, compared with only 29 percent of white respondents.  *Consumer Experiences with Debt Collection*, Consumer Financial Protection Bureau (January 2017). Other surveys demonstrate similar differences between white and non-white individuals.  *See Financial Capability in the United States*, FINRA Investor Education Foundation, 27 (July 2016).

34)    Upon information and belief, the prohibitions on households with bankruptcies or with any debt in collection are not intended to avoid households that would be delinquent in rental payments.

35)    Instead, the policies serve the purpose of shaping a tenant population that Live Downtown views as more favorable than the typical population that would apply to, and live at LIHTC properties in Grand Rapids.

36)    The population that Live Downtown favors is a whiter, less disabled, more professional tenant population than that found at other LIHTC properties in the area.

**Toni Smith's Applications**

37)    Plaintiff Toni Smith is an African-American woman who is disabled and receives Social Security Disability Income ("SSDI").

38)    Smith has been a Housing Choice Voucher holder since about 2014; her voucher is administered by Grand Rapids Housing Commission.

39)    In 2014, Smith applied for housing at 240 Ionia Avenue Apartments, a LIHTC development managed by Live Downtown.

40)    Smith was initially denied because of a criminal background issue.

41)    However, the basis for denial was later changed to be based on Smith's credit history.

42)    At the time of the application, Defendants had a policy or practice of refusing to rent to anyone with more than $2,000.00 in outstanding balances in collections.

43)    Live Downtown determined that Smith had more than $2,000.00 in outstanding balances, and denied her for that reason.

44)    At the time, Smith did not believe that she was properly denied.

45) At that time, Smith filed a complaint with the Michigan Department of Civil Rights against 240 Ionia Avenue Apartments and Defendant Live Downtown.

46) After an investigation, the Michigan Department of Civil Rights decided that there was insufficient evidence of discrimination to continue the investigation, and closed the file. At the time, Live Downtown stated that Smith was welcome to come back and re-apply.

47) In February 2017, Smith re-applied for housing with Live Downtown, with the goal of moving into 20 Fulton East.

48) 20 Fulton East is a 12 story building in downtown Grand Rapids that has commercial space, LIHTC apartments, and market-rate apartments. The LIHTC apartments are split between two limited partnerships, Defendant 20 Fulton East, LDHA, LP, and Defendant 20 Fulton East II, LDHA, LP.

49) Upon information and belief, the two separate entities are jointly owned and jointly managed.

50) An applicant does not know which entity she is applying for when applying for housing at 20 Fulton East.

51) In a form notice dated March 1, 2017, Live Downtown denied Smith's application because she had an outstanding collection amount that exceeded $500.00.

52) Shortly after the denial, Smith met with an agent of Live Downtown to discuss the denial; that person identified six debts that concerned Live Downtown.

53) None of those debts were in collections.

54) With the help of an attorney from Legal Aid of Western Michigan, Smith sent a letter to Live Downtown, explaining that the debts at issue were not in collections.

55)     In a response letter dated May 30, 2017, Live Downtown identified four other debts that it claimed were "in collections or grossly delinquent."

56)     Live Downtown refused to provide a copy of the document that it was relying on in making the denial decision.

57)     On August 1, 2017, Smith's attorney responded to the letter. For each debt identified in the May 30th letter, Smith's attorney either provided documentation showing that the debt was not delinquent or had been settled, or offered to provide the documentation.  He also requested a copy of the credit report that Live Downtown was using.

58)     Smith did not receive any further response from Live Downtown, and Live Downtown never gave any indication that it would accept Smith as a tenant.

59)     On July 30, 2018, Smith, with the help of Legal Aid of Western Michigan, filed a complaint with Department of Housing and Urban Development ("HUD"), relating to her 2017 denial of housing by Defendants.

60)     In early 2019, an employee of HUD contacted Live Downtown Grand Rapids to inquire about the complaint.

61)     In March 2019, Live Downtown sent a new form notice to Smith, stating that she was denied for housing because of an unfavorable background-credit check, because she had outstanding collection accounts exceeding $500.00, and because she had provided insufficient documentation. Though mailed in 2019, the notice was dated March 10, 2017.

## LEGAL CLAIMS

### Count 1: Disparate impact in violation of the Fair Housing Act, 42 U.S.C. § 3604

62)   Plaintiff reaffirms all previous paragraphs.

63)   The federal Fair Housing Act prohibits discrimination in housing practices on the basis of protected class status, including race and disability, under a theory of disparate impact. 42 U.S.C. § 3604; 24 CFR § 100.500.

64)   Defendants' policies restricting approval based on bankruptcies and credit actually or predictably results in a disparate impact on Plaintiff, and other black and/or disabled applicants, thus creating, increasing, reinforcing, or perpetuating segregated housing patterns because of race and disability.

65)   Defendants' policies are not necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.

66)   Further, Defendants' interests could be served by other policies or practices that have a less discriminatory effect on Plaintiff and other black and/or disabled applicants.

67)   Accordingly, Defendants' overly restrictive tenant screening policies constitute a practice which has caused an adverse impact on Plaintiff and others based on race and disability, in violation of  42 U.S.C. § 3604 and 24 C.F.R. § 100.500, resulting in injuries and damages to Plaintiff.

68)   Wherefore, Plaintiff requests a judgment awarding Plaintiff damages arising from Defendant's conduct, awarding Plaintiff punitive damages, and awarding Plaintiff reasonable attorney's fees and costs, and ordering Defendants to change their practices to comply with the statute.

**Count 2: Disparate treatment in violation of the Fair Housing Act, 42 U.S.C. § 3604**

69)    Plaintiff reaffirms all previous paragraphs.

70)    The federal Fair Housing Act prohibits discrimination in housing practices on the basis of protected class status, including race and disability. 42 USC § 3604. Upon information and belief, Defendants have established very narrow tenant selection criteria with the goal of establishing a tenant population that is disproportionately young, professional, and whiter than most LIHTC developments in the area.

71)    Upon information and belief, Defendants applied that tenant selection criteria more aggressively in reviewing Plaintiff's eligibility than they have for non-minority or non-disabled applicants. In doing so, Defendants have treated Plaintiff differently by making housing unavailable on the basis of race and disability in violation of 42 U.S.C. § 3604.

72)    Wherefore, Plaintiff requests a judgment awarding Plaintiff damages arising from Defendant's conduct, awarding Plaintiff punitive damages, and awarding Plaintiff reasonable attorney's fees and costs, and ordering Defendants to change their practices to comply with the statute.

**Count 3: Disparate impact in violation of
the Persons with Disabilities Civil Rights Act**

73)    Plaintiff reaffirms all previous paragraphs.

74)    The Michigan Persons with Disabilities Civil Rights Act ("PWDCRA") prohibits discrimination against persons with disabilities in a variety of contexts, including housing. See M.C.L. § 37.1502.

75)    Defendants' policies restricting approval based on bankruptcies and credit actually or predictably results in a disparate impact on Plaintiff, and other disabled

applicants, thus creating, increasing, reinforcing, or perpetuating segregated housing patterns because of race and disability.

76)    Defendants' policies are not necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.

77)    Further, Defendants' interests could be served by other policies or practices that have a less discriminatory effect on Plaintiff and other black and/or disabled applicants.

78)    Accordingly, Defendants' overly restrictive tenant screening policies constitute a practice which has caused an adverse impact on Plaintiff and others based on disability, in violation of  M.C.L. § 37.1502, and M.C.L. § 37.1102, resulting in injuries and damages to Plaintiff.

79)    Wherefore, Plaintiff requests a judgment awarding Plaintiff damages arising from Defendant's conduct, awarding Plaintiff punitive damages, and awarding Plaintiff reasonable attorney's fees and costs, and ordering Defendants to change their practices to comply with the statute.

### Count 4: Disparate treatment in violation of the PWDCRA

80)    Plaintiff reaffirms all previous paragraphs.

81)    PWDCRA prohibits discrimination in housing practices on the basis of disability. M.C.L. § 37.1502. Upon information and belief, Defendants have established very narrow tenant selection criteria with the goal of establishing a tenant population that is disproportionately young, professional, and whiter than most LIHTC developments in the area.

82)    Upon information and belief, Defendants applied that tenant selection criteria more aggressively in reviewing Plaintiff's eligibility than they have for non-minority or

non-disabled applicants. In doing so, Defendants have treated Plaintiff differently by making housing unavailable on the basis of disability in violation of M.C.L. § 37.1502, and M.C.L. § 37.1102.

83)   Wherefore, Plaintiff requests a judgment awarding Plaintiff damages arising from Defendant's conduct, awarding Plaintiff punitive damages, and awarding Plaintiff reasonable attorney's fees and costs, and ordering Defendants to change their practices to comply with the statute.

### Count 5: Disparate impact in violation of the Elliott-Larson Civil Rights Act

84)   Plaintiff reaffirms all previous paragraphs.

85)   The Elliott-Larson Civil Rights Act ("ELCRA") prohibits discrimination in a variety of contexts, including housing on the basis of protected class status, including race, under a theory of disparate impact. M.C.L. § 37.2502.

86)   Defendants' policies restricting approval based on bankruptcies and credit actually or predictably results in a disparate impact on Plaintiff, and other black applicants, thus creating, increasing, reinforcing, or perpetuating segregated housing patterns because of race and disability.

87)   Defendants' policies are not necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.

88)   Further, Defendants' interests could be served by other policies or practices that have a less discriminatory effect on Plaintiff and other black and/or disabled applicants.

89)   Accordingly, Defendants' overly restrictive tenant screening policies constitute a practice which has caused an adverse impact on Plaintiff and others based on race and disability, in violation of the ELCRA, resulting in injuries and damages to Plaintiff.

90)     Wherefore, Plaintiff requests a judgment awarding Plaintiff damages arising from Defendant's conduct, awarding Plaintiff punitive damages, and awarding Plaintiff reasonable attorney's fees and costs, and ordering Defendants to change their practices to comply with the statute.

### Count 6: Disparate treatment in violation of the Elliott-Larson Civil Rights Act

91)     Plaintiff reaffirms all previous paragraphs.

92)     The ELCRA prohibits discrimination in housing practices on the basis of protected class status, including race. M.C.L. § 37.2502. Upon information and belief, Defendants have established very narrow tenant selection criteria with the goal of establishing a tenant population that is disproportionately young, professional, and whiter than the populations of other LIHTC developments in the area.

93)     Upon information and belief, Defendants applied that tenant selection criteria more aggressively in reviewing Plaintiff's eligibility than they have for non-minority or non-disabled applicants. In doing so, Defendants have treated Plaintiff differently by making housing unavailable on the basis of disability in violation of the ELCRA.

94)     Wherefore, Plaintiff requests a judgment awarding Plaintiff damages arising from Defendant's conduct, awarding Plaintiff punitive damages, and awarding Plaintiff reasonable attorney's fees and costs, and ordering Defendants to change their practices to comply with the statute.

**PRAYER FOR RELIEF**

95)    Plaintiff therefore seeks a judgment:

a) Declaring Defendants' practices to violate the Fair Housing Act, Persons with
   Disabilities Civil Rights Act, and the Elliott-Larson Civil Rights Act;

b) Awarding damages to Plaintiff;

c) Enjoining Defendant from impermissibly denying housing to Plaintiff;

d) Awarding costs and attorney fees to Plaintiff;

e) Ordering Defendants to alter their tenant-selection practices to ensure that the
   practices to not cause a disparate impact on disabled or non-white tenants.

f) For such other remedial and other relief as the Court may deem just.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Respectfully submitted;

LEGAL AID OF WESTERN MICHIGAN                    July 31, 2019


/s/ *Karen Merrill Tjapkes*               /s/ *Katie M. Johnson*
Karen Merrill Tjapkes,                    Katie M. Johnson (P76708)
Legal Aid of Western Michigan             Legal Aid of Western Michigan
25 Division Ave. S., Suite 300            25 Division S. STE 300
Grand Rapids, MI 49503                    Grand Rapids, MI  49503
(616) 608-8042                            (616) 608-8047
ktjapkes@lawestmi.org                     kjohnson@legalaidwestmich.net


/s/ *John P. Smith*                       /s/ *Elizabeth L. Geary*
John P. Smith (P71368)                    Elizabeth L. Geary (P76090)
Legal Aid of Western Michigan             Legal Aid of Western Michigan
25 Division S. STE 300                    25 Division S. STE 300
Grand Rapids, MI  49503                   Grand Rapids, MI  49503
(616) 608-8047                            (616) 608-8047
jsmith@legalaidwestmich.net               egeary@legalaidwestmich.net